# The Law Office of
# Bertram C. Okpokwasili

121 Newark Avenue, Suite 518
Jersey City, N.J. 07302
Telephone: (201) 771-0394
Fax: (201) 839-3352

Bertram C. Okpokwasili, Esq.*
_____
* Member of the New York Bar and New Jersey Bar

January 30, 2020

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
 United States Courthouse
40 Foley Square
New York, New York 10007

**United States v. Fernando Gomez Latorre, 16 Cr. 387 (JMF)**
<u>Sentencing Memorandum</u>

To the Honorable Judge Jesse Furman,

I write on behalf of my client, Fernando Gomez Latorre. Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3553(a), Defense counsel respectfully submits this sentencing memorandum and requests this Honorable Court to grant him leniency and on February 11, 2020, to sentence Mr. Gomez to a below guideline sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Mr. Fernando Santiago Gomez Latorre grew up in poverty and spent his early years in the harsh projects of Puerto Rico, without a father figure. His father returned to his life when Fernando was 13, and at the age of 16, Fernando moved to Chicago to live with him.  Fernando enlisted in the Military during high school, served his country as a decorated Marine with multiple medals and awards for his service.  Upon being Honorably discharged he joined the Police Department in Evanston, Illinois. There he graduated first in the Police Academy and received the Leadership award. He became a detective and accumulated multiple awards and commendations for his work. Fernando gained praise from his superiors, the Mayor and other city officials.  When he joined the Drug Enforcement Agency, he strived at that agency as well.  Fernando loved and still loves to help people. That was and is his character. He suffered from experiencing death up close, and would suffer from flashbacks, and become withdrawn and then overly

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 2

emotional.  Once back from his tour of duty, He wanted to reconnect with his mother, sister and her family.   Fernando would fly down and visit Puerto Rico frequently to see his mother and his sister and brother-in-law.    He was wrong and misguided in his judgment was clouded in some of the steps he took.  Due to his experiences as a combat marine and police officer, Mr. Gomez suffered from symptoms that can be described as posttraumatic stress syndrome (PTSD). Although he routinely bore witness to death and disturbing acts/events as a result of his military service and career in law enforcement Fernando never sought any form of counseling out of a fear of being declared "unfit for duty." He frequently took trips to Puerto Rico as a means of "decompressing."  See PSR ¶ 102.  Defense counsel has attached a report by Nancy Tricamo, Mitigation Specialist and Psychosocial analyst that discusses this at length. See Exhibit A.

At the time of his sentence, Fernando Gomez would have served fourteen (14) months in Federal custody.  As he states in his letter to Your Honor, See Exhibit B, Fernando Gomez deeply regrets his criminal actions and requests the Court consider the totality of the circumstances of his history when setting sentence, including but not limited to his military and police service, his remorse, ██████████████████, and his role in comparison to his co-defendants and the notes on the work he achieved as an inmate.

On August 9, 2019, pursuant to a plea with the Government, Mr. Gomez pled guilty to count eighteen of Superseding Indictment as charged in a lesser-included offense of Count 18 [Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, in violation of 21 USC 841(b)(1)(C)]. The guideline applicable to the offense charged is §2D1.1, which provides for a base offense level of 30 because the offense involved between 5 and 15 kilograms of cocaine, pursuant to §2D1.1(a)(5) and (c)(5). Although the Government and Probation believes that a two-level increase is warranted because a firearm was possessed, pursuant to §2D1.1(b)(1) the Defense believes that conduct insufficient to warrant the two-level increase. The Defense believes that the criteria is met under §5C1.2(a)(1)-(5) for safety valve eligibility and that a two-level reduction is therefore warranted, pursuant to §2D1.1(b)(17).  Based upon the calculations set forth above, the defendant's stipulated sentencing Guidelines range is 70 to 87. Defense counsel will hope to persuade this Court that mitigating circumstances are present in this case.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 3


**A SENTENCE WELL BELOW THE GUIDELINE RANGE IS SUFFICIENT BUT NOT
GREATER THAN NECESSARY TO ACHIEVE THE PURPOSES OF SENTENCING**

The primary directive in 18 U.S.C. § 3553(a) is for sentencing courts to give due consideration to all of the factors set forth in 18 U.S.C. § 3553 in order to fashion a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in paragraph 2. Kimbrough v. United States, 128 S. Ct 558, 571 (2007) (quoting 18 U.S.C. § 3553(a)).  If a district court "were explicitly to conclude that two sentences equally served the statutory purpose of 3553(a), it could not, consistent with the parsimony clause, impose the higher."  United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006). Section 3553(a)(2) states that such purposes are:

   (A)    to reflect the seriousness of the offense, to promote respect for the
          law, and to provide just punishment for the offense;
   (B)    to afford adequate deterrence to criminal conduct;
   (C)    to protect the public from further crimes of the defendant; and
   (D)    to provide the defendant with needed educational or vocational
          training, medical care, or other correctional treatment in the most
          effective manner.

In determining the minimally sufficient sentence, 3553(a) further directs sentencing courts to consider the following factors:

   1)  the nature and circumstances of the offense and the history and characteristics
   of the defendant (Section 3553(a)(1));
   2)  the kinds of sentences available (Section 3553(a)(3));
   3)  the need to avoid unwarranted sentence disparities among defendants with
   similar records who have been found guilty of similar conduct (Section
   3553(a)(6)); and
   4)  the need to provide restitution to any victims of the offense.   (Section
   3553(a)(7)).


**APPLICATION OF THE 18 U.S.C. 3553(A) SENTENCING FACTORS**

   **a.  Nature and Circumstances of Offense**

Mr. Gomez is very sorry for his conduct and accepts responsibility for his offensive conduct which he details in his letter to the Court. Mr. Gomez stated in his plea,

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 4

around 2007, he did one pick up of approximately 38K at the request of his brother-in-law for Mr. Martinez-Diaz that he should have known was drug money. He was asked to make purchases of equipment for Mr. Martinez's security business. He was not paid 5,000 but paid $2, 500 including expenses. During his DEA suitability and clearance investigation, Mr. Gomez informed the investigator that he was unaware of any associates having any involvement in criminal activities.

After Mr. Gomez joined the DEA, he would sometimes divulge to his brother-in-law and Mr. Martinez-Diaz information about how to stay out of trouble and some investigative techniques used by law enforcement. Although he let other agents know he had a conflict with a cooperator because he knew him, he looked at the file to make sure his brother-in-law, and in turn his sister's family would be safe. He knows it was wrong and apologizes for his actions which were more out of concern for the safety of his sister's family as he was not remunerated for this.

## HISTORY AND CHARACTERISTICS OF FERNANDO GOMEZ

**The Need for the Sentence imposed to promote objectives of 18 U.S.C. 3553 (a)**
**(A) to reflect the seriousness of the offense, to promote respect for the law, and to**
**provide just punishment for the offense. (Section 3553(a)(2)(A))**

Mr. Fernando Santiago Gomez Latorre was born on July 20, 1977, in Rio Piedras, Puerto Rico, to Santiago Gomez, and Ana Latorre. His parents divorced approximately one year after his birth, due to the physical abuse of his mother by his father. Fernando's father is a veteran of the U.S. Army who served in the Vietnam War and became disabled due to his contact with Agent Orange. Fernando's mother is the retired secretary to the mayor of Rio Grande, Puerto Rico, where she continues to reside. His mother is financially supported through social security benefits and Fernando's help, while his father receives disability benefits and a military pension. Fernando's mother suffers from asthma, Type II diabetes and fibromyalgia, as well as recently underwent a hip replacement, while his father suffers from a skin rash, obesity and the early onset of diabetes. See PSR ¶ 87.

Childhood

Fernando had a difficult childhood and was raised by a single mother and lived in a public housing project plagued by violence and drugs. Fernando had a close relationship with his mother. He was reared in the Baptist faith and regularly attended church.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 5

Fernando's mother was the sole provider of the household and his family was poor, whereby they lacked food at times and relied on a line of credit afforded by a local neighborhood store.  At one point, after Fernando's mother saved enough for a house, the builder defrauded her and took the funds and left the construction unfinished.  Soon after in 1989, Hurricane Hugo devastated areas of Puerto Rico and forced their family to once again rebuild. See PSR ¶  89.

Siblings

Fernando has an older sister, and a younger half paternal sister.  His older sister, Sheila Gomez, lives in Puerto Rico, and is employed as both a benefits coordinator for a social services agency and the owner of a seafood store. His younger half-sister Jacqueline Gomez, lives in Chicago and works as a school teacher. His older sister's husband is Rafael Torres-Martinez, a person Fernando has known since he was twelve years old. Mr. Torres-Martinez introduced Fernando to his co-defendant, Jose Martinez-Diaz. Mr. Martinez-Diaz is also the godfather of the Fernando's nephew. See PSR ¶ 88.

Fernando leaves for the mainland

Fernando did not have any contact with his father until the he was 13 years old. In 1990, while at the home of his paternal aunt he mistakenly picked up the phone and heard his paternal father and his Aunt speaking. Up until that point Fernando's mother kept his father's contact information secret from Fernando and his sister. Fernando happened to be an excellent student and a good baseball player.  His father, acknowledging the dangerous surroundings of where Fernando lived, requested that Fernando come live with him. In 1993, Fernando eventually moved to the Chicago and lived with his father and stepmother, Zenaida . See PSR ¶  90.

Mr. Gomez enlisted in the Marine Corps during his senior year in High school

Fernando attended and played baseball, as an outfield and pitcher, for the Clemente Community Academy High School, in Chicago, IL.  While still in school Fernando enlisted in the Marines in February 1996. Fernando graduated from his high school on June 19, 1996.  See PSR ¶  111.

Mr. Gomez's Service as a Marine

From February 1996 to December 2003, Fernando was enlisted and served his

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 6

country with the United States Marine Corps. In addition to completing boot camp and combat training, as well as being stationed at various locales in the U.S., Fernando spent approximately six months aboard a ship stationed in the Mediterranean Sea, and then several months in the Persian Gulf between 1998 and 1999.  See PSR ¶ 94.

Fernando was promoted to the rank of Lance Corporal on November 1, 1996, following completion of his basic training and then ultimately rose to the rank of an E-6 Staff Sergeant. He was designated as an electrical equipment repair specialist, before ultimately becoming the chief of an outfit and responsible for overseeing 60 U.S. Marines. Fernando participated in combat missions in the Persian Gulf during his term of service and suffered numerous minor injuries as a result of training exercises and requirements. See PSR ¶  113.

Gomez also completed courses pertaining to, among other things, leadership, tactical communications, Marine Corps history and traditions, military training and operations, war fighting techniques and tactics, weapons, and military justice. See PSR ¶ 114.

Awards as a Marine

Fernando received multiple awards and commendations as a Marine. According to his DD214, He was awarded the Marine Corps Good Conduct Medal twice (2x), The National Defense Service Medal, the Armed Forces Expeditionary Medal, The Armed Forces Service Medal, the Sea Service Deployment Ribbon, the Meritorious Unit Commendation, the Navy Unit Commendation, and received seven (7) Letters of Appreciation and a Certificate of Commendation. See Exhibit F. After receiving an honorable discharge, Fernando was subsequently a Marine reservist from January 2004 to December 2005.   He suffered injuries due to his years and service and sacrifice and the Marine's designated him as 30% disabled. See Exhibit G.

Mr. Gomez joins the Evanston Police Department

From April 7, 2004, to October 19, 2011 Fernando was employed by the Evanston Police Department, before ultimately tendering his resignation in order to accept a more prestigious position with the DEA. See PSR ¶ 116. Fernando served as member of a tactical team responsible for investigating burglaries, shootings and gang activity in high-crime areas. While working with the Evanston Police Department, Fernando also graduated on December 16, 2006, with high honors, from The Richard Daly College with

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 7

an Associate Degree in Applied Science in criminal justice. Fernando, in addition to
successfully graduating from the police academy and his promotion to the rank of
detective, received numerous awards and commendations during his term of service,
including for saving individuals from a burning building and participating in an
investigation which led to the seizure of $250,000 worth of stolen goods. See PSR ¶ 116.
Additionally, Fernando through his own initiative was able to find a missing autistic
child.  Moreover, while working as a police officer, Fernando continued to work on
himself and was able to complete his college degree with honors with a Bachelor's of
Arts degree in Justice Studies by attending classes part-time at Northeastern Illinois
University from 2008 and 2010.  See PSR ¶ 109.

Defense counsel received the following partial list of recommendations from the
City of Evanston HR department. See Exhibit H . Unfortunately, Defense counsel was
not able to get information from the Drug Enforcement Agency in time. DEA Letter
January 28, 2020. See Exhibit J.

| | |
|---|---|
| 3/22/2007 | Honorable Mention to Officer Gomez for exceptional service on behalf of the police dept. for responding to a report of a missing autistic child. Due to Gomez's diligence and keen investigative skills, the child was located and safely returned to his family. |
| 9/27/2007 | Certificate of Honorable Mention for exceptional service on behalf of the EPD. Officer Gomez responded to a robbery in progress. Located person matching the description of the suspect en route to the call and advised them to stop. The suspect threw an item of clothing into a nearby vehicle and stopped. Officer placed the suspect and the driver of the vehicle into custody.  Due to Officer Gomez's diligence and team work, three suspects were charged with felony robbery. |
| 2/15/2008 | Unit Citation awarded to Burglary Mission Team of EPD Det. Gomez - formed to begin surveillance and intelligence gathering. Intelligence was gathered and warrant was executed. Recovered were drugs and handguns. One of the largest seizures of stolen property in the history of EPD. |
| 7/17/2008 | Letter from Mayor Morton to Chief Eddington thanking their participation and spirit for making the Fountain Square Rededication a huge success. |
| | Certificate of Honorable Mention for exceptional service on |

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 8

|  |  |
|---|---|
|  | behalf of the EPD. Missing autistic child. Officer Gomez and his partner took the initiative and began searching nearby private drive and located the child and rescued him from the water. Due to their diligence the child was located and safely returned to his family |
| 9/3/2008 | Mayor Morton complimented Officer Gomez and other officers for assisting to make the Fountain Square Rededication Ceremony a success.

Complimenting praiseworthy police work by Officer Fernando Gomez. Mayor Morton complimented everyone who assisted in making the Fountain Square Rededication Ceremony a huge success. Named Officer Gomez and another officer as "admirable representatives of the EPD" and the mayor "extends a personal thank you to each office for their participation". |
| 10/21/2008 | Unit Citation awarded to Tactical Unit of EPD Det. Gomez - joint operation with Cook County Sheriffs Police, Skokie, Wilmette, and Lincolnwood - "Operation Quick Buck" recover proceeds from criminal acts. A resale shop was set-up and officers were assigned to operate the store. During the 4- month operation a total of 160 items were recovered and 2 felony count of possession of stolen property and 1 count of theft were charged. |
| 4/29/2009 | Letter of Appreciation for Det. Gomez for responding to a call for a subject with a gun on July 6, 2008. Subject was chased on foot, located and placed under arrest, and revolver was located.

Letter of Appreciation for Detective Gomez for Case 08-20656 on July 6, 2008 where he responded to call for a subject with a gun. The offender fled on a foot. Subject was located and placed under arrest and the detective located a revolver. |
| 3/6/2010 | Certificate of Recognition to Detective Gomez for responding to a residential burglary in progress. Pursued offender on foot which led to the subject's apprehension and recovered one of the computers taken by offender in burglary.

Certificate of Recognition to Detective Gomez for on foot apprehension of a suspect in a residential burglary which lead to recovery of stolen property and filing of felony charges. |
| 11/24/2010 | Letter from Glenview Chief of Police William Fitzpatrick thanking Det. Gomez, et al for their role in the success of "Operation Cross Country". |

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 9

| | Letter from Chief Eddington to Glenview Police Dept Chief William Fitzpatrick thanking him for letter of commendation to Det. Gomez, et al who participated in "Operation Cross Country" |
|---|---|
| | Thank you letter for Gomez's role in Anti-Prostitution Sting "Operation Cross County" with Skokie, Evanston and Glenview Police. |
| 1/31/2009 [sic] ( This year is supposed to be 2011) | Unit Citation awarded to the Tactical Unit for 4-month long "Operation Quick Bucks" with the Cook County Sheriffs Police, Skokie, Wilmette, and Lincolnwood. That operation resulted in 2 felony counts of possession of stolen property and 1 count of theft. Also revealed that drug dealing was taking place in the immediate area and that information that shared with the NET team and a narcotic investigation took place. |

Mr. Gomez Joins the Drug Enforcement Agency

From September 2011 to December 2018, Fernando was employed as a special agent for the U.S. Drug Enforcement Administration (DEA). Fernando was stationed in Quantico, VA, between 2011 and 2012, while completing required training for his position with the DEA, and then stationed at field offices in Puerto Rico between 2012 and 2015. See PSR ¶ 94. In 2015, he returned to Chicago.  From 2017 to December 11, 2018, while continuing to work at his job, Fernando worked on getting his master's degree, attending Calumet College of St. Joseph's Graduate School, located in Chicago, IL.  See PSR ¶ 110.

Fernando served as a criminal investigator and member of the technology group at the time of his arrest, which was responsible for, among other things, setting up surveillance cameras and GPS tracking devices on target vehicles. He previously served as an undercover enforcement agent and was relocated to Puerto Rico for several years due to the demands of the agency. Among other awards, Fernando received a commendation on November 16, 2016, for being part of task force (HIDTA Task Force Group 43) which sought to combat a violent "International Transnational Criminal Organization."  See PSR ¶ 115. Fernando received an "indefinite suspension" following his arrest for the instant offense and was stripped of his security clearance, badge, credentials and service weapon.  See PSR ¶ 115 of Sentence report.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 10

## FERNANDO'S IMMEDIATE FAMILY

Fernando has an eighteen-year-old son, Y.G., from a prior consensual relationship
with Yireyma Rivera. He stays in contact with his son and continues to make bi-weekly
child support payments of $300.00. See PSR ¶ 93. Fernando maintains a romantic
relationship with Ms. Claudia Erazo, who resides in Chicago, Illinois with their two-year-
old daughter S.G. Their daughter had to have surgery to correct a breathing obstruction in
her nose and is presently healthy. See PSR ¶ 91.

## FERNANDO SUFFERED DUE TO HORRIBLE CONDITIONS IN THE PRISON

Fernando was initially housed at the Metropolitan Correctional Center's (MCC)
Specialized Housing Unit (SHU) for approximately two months, during which time he
was locked in his cell 24 hours per day and had no contact with other individuals, other
than being provided with meals by corrections staff. Additionally, the cell had no window
and was infested with insects and vermin. See PSR ¶ 103. Moreover, reportedly inmates
are often served expired milk, often lack heat and hot water.   The prison conditions
exacerbated the physical issues with his feet and back that he suffered as due to his
military service. One bright spot is that for the last few months, Fernando has been able
to meet with a group of veterans suffering from PTSD every Friday.

## HIS REHABILITATION AND CONTRIBUTION TO HIS FELLOW INMATES IS NOTABLE

Fernando's summary reentry plan attached as an exhibit shows that he has been
doing outstanding work at the MCC as a library clerk and helping fellow inmates
complete their general equivalency diploma's ('GED') as an outstanding tutor for the
MCC. Additionally, Fernando has taught classes to inmates and worked as a suicide
watch companion, and a translator assisting staff and fellow inmates. Fernando has
completed over 45 courses to date, including those pertaining to national parks, nature
and wildlife, historical figures, ancient civilizations, leadership, marketing, business,
music appreciation, tutoring, and child support. He has also been enrolled in the Southern
District of New York's Focus Forward program since July 22, 2019. Additionally,
Fernando has received several certificates of recognition.  See PSR ¶ 27.

**(B) To afford adequate deterrence to criminal conduct. The pending incapacitation
will be sufficient to deter any further criminal behavior. (Section 3553(a)(2)(B))
(C) To protect the public from further crimes of the defendant. (Section
3553(a)(2)(C))**

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 11

With regard to the necessity to protect society from future crimes of the defendant, sentencing courts have previously declined to impose lengthy Guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that "[r]ecidivism rates decline relatively consistently as age increases." (quoting U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines*, at 12 see, e.g., United States v. Carmona-Rodriquez, No. 04 Cr. 667(RWS), 2005 WL 840464, at *5 (S.D.N.Y. Apr. 11, 2005) (2004); (Stating recidivism rates of defendants in Category I between the ages of 41 and 50 is 6.9 percent). Daniel Nagin's 2013 deterrence report, published on the National Institute of Justice website, stated "To clarify the relationship between the severity of punishment and the deterrence of future crimes, you need to understand:   The lack of any "chastening" effect from prison sentences; That prisons may exacerbate recidivism; The different impacts of the certainty versus the severity of punishment on deterrence; and that individuals grow out of criminal activity as they age."[1] He reports that age is a powerful factor in deterring crime and "[e]ven those individuals who commit crimes at the highest rates begin to change their criminal behavior as they age. The data show a steep decline at about age 35." Id. quoting Sampson, Robert. J., John H. Laub and E.P. Eggleston, "On the Robustness and Validity of Groups," Journal of Quantitative Criminology 20 (1) (2004): 37-42.

**LEGAL STANDARD**

The Supreme Court held in U.S. v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), that the United States Sentencing Guidelines are not mandatory and should not be applied to the exclusion of other important factors.

In light of Booker, a sentencing court is no longer bound by the policy statements or guideline range calculated under the Sentencing Guidelines Manual. The guidelines are still "the starting point and the initial benchmark." Kimbrough v. United States, 128

---

[1] https://nij.gov/five-things/pages/deterrence.aspx quoting Nagin, Daniel S., "Deterrence in the Twenty-First Century," in Crime and Justice in America: 1975-2025, ed. M. Tonry, Chicago, Ill.: University of Chicago Press, 2013: 199-264.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 12

S.Ct. 558, 574 (2007). Indeed, a "sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a . . . Guidelines sentence or not." U.S. v. Sanchez, at *2, 2007 WL 60517 (S.D.N.Y**.**) See United States v. Crosby, 397 F.3d 103, 114-115 (2d Cir.2005). The Supreme Court has determined that there is no need to find that the circumstances meriting a non-Guidelines sentence are significant or extraordinary." Gall v. United States, 128 S.Ct. 586, 595 (Dec 10, 2007). The "Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Nelson v. U.S., 129 S.Ct. 890, 892 (January 26, 2009). (emphasis added).

        The Supreme Court has stated that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 131 S.Ct. 1229, 1239-40 (2011) (quoting Koon v. United States, 518 U.S. 81, 113 (996)).  Determining the appropriate sentence "requires a court to consider with great care and sensitivity, a large complex of facts, and factors." United States v. Gupta, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).  It is essential that a court's sentencing decision be informed and guided by the fundamental doctrines of mercy and compassion. See United States v. Blarek, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998). See also, e.g., United States v. Engler, 806 F.2d 425, 440 (3d Cir. 1986) ("it has been traditionally recognized that collateral consequences of felony convictions are both inevitable and serious"); Parker v. Ellis, 362 U.S. 574, 593-94 (1960) (Warren, C.J., dissenting) ("conviction of a felony imposes a *status* upon a person which ... seriously affects his reputation and economic opportunities").

**MILITARY SERVICE AND PTSD**

        Courts have taken into consideration a defendant's military service and commendations into consideration during sentencing. Courts have also taken into consideration the possible effects of PTSD.

        In United States v. Chapman, 209 Fed. Appx. 3 (1st Cir. 2006) the defendant was given a  40-month sentence, a reduction from the guideline range of 70-87 months, for illegal reentry offense was not unreasonable where the district court considered, among

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 13

other things, defendant's military service. See United States v. Chapman, 209 Fed. Appx. 3 (1st Cir. 2006). In United States v. Canova, 412 F.3d 331 (2d Cir. 2005), Canova was convicted of offenses involving a multi-million-dollar Medicare fraud. The district court did not err when departing downward to a sentence of probation in consideration of, among other things, defendant's extensive, exemplary service as a volunteer firefighter; and six-year Marine Corps service. See United States v. Canova, 412 F.3d 331 (2d Cir. 2005). In United States v. Bruder, 103 F.Supp.2d 155 (E.D.N.Y. 2000), rev'd in part, vacated in part, by United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002). Bruder was convicted of violating the civil rights of an arrestee and conspiracy, aiding and abetting in the sexual assault of Abner Louima. The district court did not err when it departed downwards four offense levels based, in part, on defendant's family ties, solid employment history, and military service in the Marine Corps (which included various decorations and honorable discharge). See United States v. Bruder, 103 F.Supp.2d 155 (E.D.N.Y. 2000).

In the fifth circuit, in United States v. David Cooper, 15 CR 50 HSO-JCG-1_S.D. Miss, former 16 year marine, David Kimball Cooper, was arrested and charged with heading up a drug-trafficking organization whose buyers included military members., where they seized $170,000 dollars' worth of drugs, including Xanax, Molly, MDMA, Methphetamine, LSD, and cocaine during the arrest[2].Reportedly the evidence had included texts where Cooper is telling his sellers explains how to make good money in the drug business. "You hook them and you will make a killing," he wrote. "I will show you how." In another text, he tells a man talking about buying and selling drugs to "Go ahead and make us some money." One correspondent questions whether to sell the drugs to someone who doesn't have a lot of money. Cooper responds, "It's fine to nickel and dime them."[3] Cooper was subsequently sentenced to 60 months by District Judge Halil Suleyman Ozerden. Id.

In United States v. Carper, 659 F.3d 923 (9th Cir. 2011). A variance was affirmed where the defendant, a Marine, violated the Arms Export Control Act. The sentencing

---

[2] https://www.wlox.com/story/25654931/mbn-raid-turns-up-more-than-170k-worth-of-drugs/.

[3] https://www.military.com/daily-news/2016/01/29/former-marine-who-served-iraq-afghanistan-headed-prison-drugs.html.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 14

court granted the variance based on Casper's military service and because there was little

to no likelihood of recidivism. See United States v. Carper, 659 F.3d 923 (9th Cir. 2011)


**SAFETY VALVE AND THE 2D1.1 ENHANCEMENT REQUIRE TWO DIFFERENT ANALYSES.**

A defendant who qualifies under §5C1.2 is not subject to any statutory minimum

sentence or minimum sentence of supervised release and also receives a decrease in the

guideline. Under the sentencing guidelines Mr. Gomez qualifies for such relief if he

meets the following requirements:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
> U.S.S.G. § 5C1.2

Defense respectfully urges this Court to make two separate analyses, one to see if

the 2D1.1(b)(1) enhancement proposed by the Government and Probation applies, and a

separate analysis under U.S.S.G. § 5C1.2. Defense would assert that Mr. Gomez would

qualify for the Safety Valve and should not receive the 2D1.1(b)(1) enhancement for the

following reasons.

The Honorable Jesse M. Furman
January 30, 2020
P a g e  | 15

### CASE LAW STATES GOVERNMENT MUST ESTABLISH THAT WEAPON'S PRESENCE IS REASONABLY FORESEEAABLE DURING CONDUCT RELEVANT TO THE OFFENSE AT ISSUE .

The commentary to section 2D1.1(b)(1) states that two levels should be added for possession of a firearm "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 comment. n.3. Second Circuit "case law indicates that once the government has established that a weapon's presence was reasonably foreseeable to the defendant during **conduct** (emphasis added) (i.e., the storage and cutting of drugs) relevant to the offense (i.e., distribution of drugs) at issue, the enhancement will apply, unless the defendant demonstrates that it is clearly improbable that the weapon was connected with the drug offense." United States v. Melendez, 2005 U.S. Dist. LEXIS 12038, at 14-15 (S.D.N.Y. June 13, 2005) (Where 2D1.1 enhancement did not apply where Defendant, involved in drug trade, fired pistol in self-defense as activity was not connected to drug dealing activity.)

The Melendez court reasoned:

As the two men approached Peters' apartment, Peters, a member of the "Bloods" gang, "had words" with several men on the street corner who were from the Peters's rival gang, the "Crips." Melendez and Peters went to Peter's apartment, and upon leaving a short while later, they noticed a large group of "Crips" waiting for them. A shoot-out ensued, with the "Crips" men first firing on Melendez and Peters. Peters, who possessed two guns, passed one to Melendez to use in self-defense. Once both men escaped unharmed, Melendez returned the firearm to Peters.

The government does not object to the narration provided by Melendez, but instead argues that a shoot-out between two rival gangs during which Melendez possessed a firearm is sufficient to apply the firearm enhancement because Melendez was seeking to protect Peters, a co-conspirator in the Organization.

However, the Second Circuit in United States v. Smith, 215 F.3d 237 (2d Cir. 200), (full case quote added) requires a connection between the drug offense and the possession of a firearm. Melendez possessed the gun for only a few moments, and held it in self-defense, while being fired upon by men whom he did not know. He was not in the process of conducting business on behalf of the Organization. He simply was walking down the street when his companion, and in this case co-conspirator, chose to engage in hostilities with rival gang members. Melendez had no stake in Peters's confrontation with the "Crips" and did not participate in the build-up to the shoot-out. Melendez temporarily possessed the firearm after finding himself in the cross-fire

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 16

between rival gang members, and, as such, did not possess the firearm to further goals
of the conspiracy. No two level enhancement for possession of a firearm will apply
under U.S.S.G. § 2D1.1(b)(1) . United States v. Melendez, 2005 U.S. Dist. LEXIS
12038, at *16-18 (S.D.N.Y. June 13, 2005).

    In this case, Melendez did not possess the weapon to further the drug conspiracy,

and the event noted, the shootout, was not one to further the drug conspiracy. As in

Melendez, guns in this case where not used to further the goals of the conspiracy or any

agreement to partake in unlawful conduct between Mr. Gomez, his brother–in–law, or

Mr. Diaz.   See United States v. Monk, 418 Fed. Appx. 5; 2011 U.S. App. LEXIS 7475,

No. 09-3618-cr (2d Cir. April 11, 2011) (The circuit agreed that this evidence, although

it proved that "Monk at some point possessed a gun," failed to "establish the necessary

connection between the gun and the offense conduct" and that to affirm the enhancement

on these facts would "be expanding [its] scope … in an unprecedented manner.")

    Cases "supporting a gun possession enhancement are premised on either the

finding of a gun, or on other evidence establishing the possession of a gun during the

offense conduct." See United States v. Gaskin, 364 F.3d 438, at 466, (applying gun

possession enhancement where witness saw defendant armed while buying drugs);

United States v. Smith, 215 F.3d 237, 238 (2d Cir. 2000) (finding gun possession

enhancement warranted where three handguns were found); United States v. Sweet, 25

F.3d 160, 162-63 (2d Cir. 1994),(holding enhancement was warranted where two guns

were seized from defendant's residence where drugs were also cut and sold). United

States v. Monk, 418 F. App'x 5, 7 (2d Cir. 2011)

    The Monk Court reasoned

    Were we to affirm the imposition of the enhancement without a specific finding
    linking the testimony to the relevant offense conduct, we would be expanding
    the scope of the enhancement in an unprecedented manner." Id.  The
    "applicability of a specific offense characteristic, such as section 2D1.1(b)(1),
    depends on whether the conduct at issue is 'relevant' to the offense of
    conviction." United States v. Pellegrini, 929 F.2d 55, 56 (2d Cir. 1991). Id.
    Drug offenses involve a wide scope of "relevant conduct" including "all acts
    and omissions committed, aided, abetted, counseled, commanded, induced,
    procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a). quoting
    United States v. Monk, 418 F. App'x 5, 8 (2d Cir. 2011). Nevertheless, "a

weapon must have been "possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction" for the enhancement to apply." United States v. Ortega, 94 F.3d 764, 767 (2d Cir. 1996), quoting United States v. Monk, 418 F. App'x 5, 8 (2d Cir. 2011).  In Ortega, the "district court found defendants possessed a firearm, but "did not find that defendants-appellants were involved in drug activity at that time, or that any drug activity in which they were then involved was part of the same course of conduct or common scheme or plan as the later-occurring offense of conviction." Id. at 768. The reviewing court therefore remanded, explaining "it was necessary to make a prior determination that the asserted possession of a weapon occurred during conduct relevant to the offense of conviction." Id. (emphasis added). The reasoning in Ortega applies with equal force to Monk's case, and additional findings by the district court are necessary to justify the application of § 2D1.1(b)(1). United States v. Monk, 418 F. App'x 5, 8-9 (2d Cir. 2011).

Approximately around 2008, when Mr. Diaz asked Mr. Torres to inform let Mr. Gomez that Mr. Diaz was interested in Mr. Gomez's personal pistols, Mr. Gomez agreed as he remembers being told by Mr. Torres that Mr. Diaz stated it would be for the personal use for he and his wife. More importantly, Mr. Gomez requested and received the return of one his pistols from Mr. Diaz after Mr. Gomez found out from Mr. Torres that Mr. Diaz, hurting for money at the time, sold one of the pistols to the bar owner who leased space from Mr. Gomez's brother-in-law. Mr. Gomez never sold any pistols to Mr. Diaz after that. These were not actions of an agreement to use weapons in the furtherance of a drug conspiracy.  In this case, the Government is wrong to apply the 2D1.1 enhancement.

Defense counsel would argue that the facts in the present case are distinguishable from the facts in the case the Government cites, United States v. Ryan, 2019 WL 3849549 (2nd Cir. Aug. 16, 2019).  In Ryan, the Government states " the enhancement applied because the defendants sold a large quantity of heroin to a confidential informant a week before the defendants sold the same informant a shotgun." That shotgun was part of the initial deal and the defendant in Ryan forgot it and offered more drugs to the buyer in exchange for forgetting.

In Ryan, the Court shows a connection/nexus as Smith calls for, between the gun and the drug crime.  However Ryan is not analogous to this case, and doesn't even

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 18

reference 2D1.1(b)(1), (it references 2k2.1(b)(6)(B)), because in this case,  there was no
immediate nexus to an event resembling an agreed upon drug sale or drug deal or
exchange of guns for drugs. There is no "presence" of a weapon at any location or stash
house.  It is not reasonable or fair to hold Fernando to a strict foreseeability standard
without more. Even if there was an event in this case, which the Government is not
citing, one of the guns went back to Fernando, and hasn't been implicated in any
"event" and one of the guns was sold, without Fernando's knowledge to a civilian bar
owner who rents space from Fernando's brother in law.

  Probation is incorrect on its assertion that Defendant has to show improbability to
qualify for the Safety valve, as inclusion of an enhancement does not preclude Safety
valve eligibility.  US v. Nelson, 222 F. 3d 545 (9th Cir. 2000) (the "clearly improbable"
test does not apply to the safety valve and therefore a defendant need only show by a
preponderance that the weapon was not used in connection with the offense under
section 5C1.2(2); See also US v. Barron, 940 F.3d 903 (6th Cir. Oct. 15, 2019) (The
Sixth Circuit reversed, holding that the fact that defendant could foresee a codefendant's
possession of a firearm did not preclude application of the "safety valve," and that
defendant's failure to provide an explanation of a large amount of money found with the
drugs in his room did not disqualify him from obtaining a sentence below the mandatory
minimum.)

  The government makes an argument citing the purchase alone by Mr. Diaz, a
known drug dealer, as proof of its only burden. However, the Government has not
outlined any event or specific drug trafficking activity as noted in the cases above
connecting Mr. Gomez's personal pistols to a conspiracy between Fernando and Mr. Diaz
to deal narcotics.

  The 2D1.1 enhancement should not apply. Even if hypothetically so, that does not
exclude Fernando from qualifying for the Safety Valve under 5C1.2.  The pertinent
provision is the following:

> (2) the defendant did not use violence or credible threats of violence or
> possess a firearm or other dangerous weapon (or induce another
> participant to do so) in connection with the offense…U.S.S.G. § 5C1.2.

  How would Mr. Gomez taking the gun back from Mr. Diaz "event,"  be indicative

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 19

of  one who is partaking in the same course of conduct or common scheme or plan with that same individual in the offense of conviction?  Thus Defense respectfully asserts that the 2D1.1 enhancement should not apply, but nonetheless, Mr. Gomez should qualify for the safety valve.

### PROPOSED GUIDELINE CALCULATION

Defense counsel submits that Mr. Gomez, has a criminal history point of I, no violence or weapons were used, and the offense did not result in death or serious injury. 21 U.S.C. § 846 and 841 (b)(1)(C) does not require a statutory minimum term of imprisonment.

Defense counsel will argue for and believes Mr. Gomez meets the criteria set forth in subdivision (l)-(5) of U.S.S.G. § 5CI .2. and so a 2-level decrease in the offense level is warranted pursuant to U.S.S.G. § 2Dl.l(b)(17).  Defense counsel will also argue that the 2D1.1 enhancement does not apply.

**Adjustment for Acceptance of Responsibility:**

Mr. Gomez plead guilty, and the Government states in its plea agreement that a 2-level reduction is warranted per Guidelines § 3E1.1(a). Moreover, because the Government was notified in a timely manner by the defendant of his intention to pled guilty another 1 level is subtracted Per Guidelines § 3E1.1(b).

Base Offense Level (21 U.S.C. §§ § 846, and 841 (b)(1)(C)))          30
Adjustment for Role in the Offense – The Defendant abused
a position of public trust in a manner that significantly facilitated
the commission or concealment of the offense, therefore a two-level
increase is warranted, pursuant to §3B1.3                              +2
Less: Meets criteria of subdivision (l)-(5)
of U.S.S.G. § 5CI .2 and so 2 level reduction
per U.S.S.G. § 2Dl.l(b)(17)                                            -2
Less: Acceptance of Responsibility (3E1.1(a)and (b))                   -3
Total:                                                             27

Therefore, at level 27, the Defense will argue that (SGR) is 70-87 months.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 20

## SECOND CIRCUIT COURTS HAVE FASHIONED NON-GUIDELINE SENTENCES SUBSTANTIALLY BELOW THE MINIMUM OR SENTENCE GUIDELINE RANGE UNDER A 18 U.S.C. § 3553 (A) ANALYSIS.

In United States v. Samuels, 2009 WL 875320 (S.D.N.Y.) the defendant pled guilty to pleaded guilty to one count of conspiracy to distribute and possess with an intent to distribute crack cocaine in violation of 21 U.S.C. § 846, and 21 841 (b)(1)(A) and faced and advisory guideline of 70 to 87 months. The defendant was part of a cocaine and cocaine –base drug distribution business that controlled business in a housing project in the Bronx, where members of the organization "carried and used weapons in furtherance of the narcotics conspiracy." The court sentenced the defendant to 15 months and noted under a 18 U.S.C. § 3553(a) analysis that defendant,

> was raised under poor economic circumstances with an abusive father addicted to crack. She dropped out of school in order to support her family, and she has stated that her sale of narcotics was for economic reasons. Her abuse of crack was never extensive, and she reportedly stopped abusing and selling crack in November 2007 on her own initiative, two months prior to her arrest. The probation officer noted in the PSR that her abuse of drugs was a source of embarrassment to her and kept from her family, and Samuels has stated that she has no desire to ever use drugs again.
> ...
> Samuels has acknowledged responsibility for her actions, stated that she has learned a valuable lesson from it, and seeks move forward to become a productive member of society. Her 15 months of incarceration reflect the positive change that the Defendant seeks to make in her life. She has successfully completed a typing class, undergone Inmate Companion Training, is pursuing classes in order to earn a GED degree, and leads a trusted cleaning crew that is permitted access to nearly all parts of the MDC. U.S. v. Samuels, 2009 WL 875320*4 (S.D.N.Y.)

In United States v. Singh, the defendant "pled guilty to counts One and Two of a two-count superseding information". U.S. v. Singh, 2009 WL 4626645*1 (E.D.N.Y.). Count One "charged that between September 2007 and November 2008, [defendant], together with others, conspired to distribute and possess with the intent to distribute heroin, in violation of 2 1 U . S . C . §§ 846 and 841(a)(1), and 841(b)(1)(A)." Id.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 21

Count Two "charged that in September 2007, [defendant], conspired to possess and distribute ephedrine, a listed chemical, having reasonable cause to believe it would be used to manufacture methamphetamine, a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(c)(2)." Id. The defendant faced a sentencing guideline of 27, a range of 70 to 87 months. On November 24, 2009 the court using an 18 U.S.C. § 3553 analyses sentenced defendant to time served. The court noted that

> The sentence will send a clear message that any involvement in drug conspiracy will not go unpunished. Specific deterrence is achieved through the year the defendant spent in prison prior to his sentencing and the impact of his deportation as a result of his conviction. It is unlikely that he will engage in further criminal activity in light of the remorse he has shown and his strong desire to support his elderly parents in India. U.S. v. Singh, 2009 WL 4626645*1 (E.D.N.Y.).

**Mr. Gomez's Role is Limited in Comparison to His Co-Defendant And Should Be Considered Under 18 U.S.C. 3553 (A)(6)**

A district court may "…compare co-defendants' sentences to avoid unwarranted sentencing disparities…", U.S. v. Menendez, 600 F.3d 263, 269-270 (2d Cir. Mar. 29, 2010) See also United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008)  (A district court may, in its discretion, "consider disparities between codefendants.") The Guidelines were "intended to eliminate national disparity," but courts do not, …"as a general matter, object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence." – United States v. Stewart,  590 F.3d 93, 140 (2d Cir 2009).

Amendment 794, the commentary to §3B1.2, revised in November 2015, states in part:

> "However, a finding that the defendant was essential to the offense does not alter the requirement, expressed in Note 3(A), that the court must assess the defendant's culpability relative to the average participant in the offense. Accordingly, the amendment revises the commentary to emphasize that "the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative" and that such a defendant may receive a mitigating role adjustment, if he or she is otherwise eligible."

As amended, Guideline 3B1.2's application notes provide in part:

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 22

(C) Fact-Based Determination.— The determination whether to apply subsection
(a) or subsection (b), or an intermediate adjustment, is based on the totality of the
circumstances and involves a determination that is heavily dependent upon the
facts of the particular case. In determining whether to apply subsection (a) or (b),
or an intermediate adjustment, the court should consider the following non-
exhaustive list of factors: (i) the degree to which the defendant understood the
scope and structure of the criminal activity; (ii) the degree to which the defendant
participated in planning or organizing the criminal activity; and (iii) the degree to
which the defendant stood to benefit from the criminal activity.

Pursuant to the plea agreement Mr. Gomez does not have a mandatory minimum.
The plea agreement does not allow Defense counsel to argue for a minor role under the
guidelines. A defendant does not have to be sentenced within the ranges established in
the Sentencing Guidelines if the court finds "an aggravating or mitigating circumstance
of a kind, or to a degree, not adequately taken into consideration by the Sentencing
Commission in formulating the guidelines that should result in a sentence different from
that described." 18 U.S.C. § 3553(b). Therefore, it is respectfully submitted, in
accordance with the plea agreement, that the court take into consideration as one of the
factors under 18 U.S.C. § 3553(a) that the Mr. Fernando Gomez's role in the offense is
limited in comparison to his co-defendants listed in the PSR. Out of all the co-defendants
Mr. Gomez, only knew Mr. Martinez-Diaz. Any narcotics deals were managed and
brokered by his co-defendants. It appears Mr. Martinez-Diaz plead to a racketeering
conspiracy dealing in significant weight of cocaine.

As Probation noted regarding the position of the defense, there are various
mitigating factors to be considered in imposing sentence, pursuant to 18 USC 3553(a),
including among others, that the basis of Fernando's crime was information sharing and
failure to report criminal activity, as opposed to operational and/or overt criminal acts of
receiving or delivering drugs; that the defendant became involved in the instant offense
due to familial ties, principally the godfather of his nephew, co-defendant Jose Martinez-
Diaz; and the defendant's history of service to the U.S. as a marine, police officer and
DEA agent. See PSR ¶ 139.

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 23

███████████████████████

  ██████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████


**CONCLUSION**

Defense counsel respectfully submits that there are ample meritorious reasons for
the court to fashion a sentence "sufficient, but not greater than necessary" under 18
U.S.C. § 3553 when considering the totality of the circumstances, his cooperation with
authorities, his service in the Marines and as a Police Officer, his health matters, his

The Honorable Jesse M. Furman
January 30, 2020
P a g e | 24

history and characteristics, and that he has lost the ability to work in what drove him

since childhood, law enforcement,  to impose a below guideline sentence of  twenty-four

months in this matter.  Attached are letters from friends and family, and work information

from the MCC, and past commendations and awards, that attest to Mr. Gomez's good

character and positive influence in the lives of the writers.   My client understands that he

is at the mercy of this court and he and his family beg your Honor for leniency.

Respectfully submitted,

_____/s/ Bertram C. Okpokwasili_____
BERTRAM C. OKPOKWASILI
Attorney for Fernando Gomez Latorre

This document is ORDERED held by the Clerk in a vault or other secure place until
further order of this Court.

SO ORDERED:

_____
THE HONORABLE JESSE M. FURMAN
SECOND CIRCUIT COURT JUSTICE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CC:     AUSA Jordan Estes