*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 4, 2020

The Honorable Jesse M. Furman
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States v. Fernando Gomez*, S5 16 Cr. 387 (JMF)

Dear Judge Furman:

    The Government respectfully submits this letter in advance of the sentencing of defendant Fernando Gomez. Gomez pled guilty to one count of conspiring to distribute and possess with the intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846. The Government respectfully submits that a sentence within the applicable Sentencing Guidelines range of 108 to 135 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

### A. Offense Conduct

    The charges in this case arose out of an investigation conducted by the United States Postal Inspection Service, the Drug Enforcement Administration ("DEA"), and the New York City Police Department into La Organización de Narcotraficantes Unidos ("La ONU"), a violent narcotics trafficking organization involved in shipping thousands of kilograms of cocaine from Puerto Rico to New York. PSR ¶¶ 28-29.

    Gomez provided illicit assistance to two members of La ONU at various times over a period of years. Gomez, who grew up in Puerto Rico, found his way into this activity through his close relationship with Rafael Torres-Martinez, his brother-in-law; Torres-Martinez, in turn, introduced Gomez to Jose Martinez-Diaz, a/k/a "Tony Zinc," a high-volume cocaine trafficker. PSR ¶¶ 41, 52. While the Government does not dispute that the relationship between the three men appears to have been primarily been one of friendship, Gomez was aware that Martinez-Diaz was a drug trafficker who associated with violent criminals and, over time, Gomez aided him with his criminal enterprise. For example, on one occasion, Gomez picked up approximately $45,000 in drug money for Martinez-Diaz from the Boston area and transported it to Puerto Rico. PSR ¶ 53. Gomez was paid approximately $5,000 for conducting this money pickup. *Id.* On another occasion, Gomez sold two firearms to Martinez-Diaz. PSR ¶ 54. Moreover, Gomez did all of this while employed as a sworn officer of the City of Evanston Police Department. PSR ¶¶ 52, 116.

    Gomez continued assisting Martinez-Diaz even as Gomez pursued work as a federal law enforcement officer. In or about 2010, Gomez applied to work for the DEA. During his DEA

February 4, 2020
Page 2

suitability and clearance investigation, Gomez falsely informed the investigator that he was unaware of any associates having any involvement in criminal activities. PSR ¶ 55. After Gomez joined the DEA, he helped Martinez-Diaz and Torres-Martinez evade detection by law enforcement. PSR ¶ 56. For example, Gomez told Martinez-Diaz and Torres-Martinez about DEA activities, including investigative techniques used by law enforcement. *Id.* And in one particular instance, Gomez accessed DEA files for a cooperating witness against Martinez-Diaz. *Id.*

In all the years that Gomez worked as a DEA agent—including the years he was stationed in Puerto Rico and his colleagues investigated associates of La ONU—Gomez never alerted his employer that he knew Martinez-Diaz and knew of his drug operation.

### B. Procedural History and the Applicable Guidelines Range

On December 10, 2018, the Grand Jury returned a nineteen-count Indictment. Dkt. 211. The defendant was charged with two counts: one count of conspiring to distribute and possess with the intent to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(A) and 846 (Count Eighteen), and one count of using, carrying, and possessing a firearm during an in relation to that narcotics conspiracy, in violation of Title 18, United States Code, Section 924(c) (Count Nineteen). On December 11, 2018, the defendant was arrested and presented before Magistrate Judge Susan E. Cox in the Northern District of Illinois. The Government sought detention. Judge Cox ordered the defendant released once he had met all of the bail conditions. On or about January 7, 2019, the parties appeared before the Court, who ordered the defendant detained pending trial. The defendant has been in custody since his December 11, 2018 arrest.

On August 9, 2018, the defendant appeared before Your Honor and pled guilty to Count Eighteen of the Indictment pursuant to a plea agreement (the "Plea Agreement") with the Government. During the change-of-plea proceeding, Gomez described how he helped Martinez-Diaz's drug activity:

> Your Honor, in 2007 I met my co-defendant, who was a close friend of my family member's, in—living in Puerto Rico. I once picked up money that I should have known that it was—came from illegal means. I shared information with my codefendant on how to detect traps in vehicles. On occasions, I provided same codefendant with locations to avoid that were under investigation. I also failed to report illegal activities of the same codefendant after hearing about the illegal activities after the fact. And I knew that the codefendant was a drug dealer and what I did allowed him to continue his drug trafficking.

Tr. of August 9, 2019 Plea Conference, ECF Doc. 290 at 24:10-20. When the Court inquired about whether "the things you did to assist him you did knowing that they would advance and facilitate the distribution of cocaine," Gomez responded, "Yes, your Honor." ECF Doc. 290 at 25:09-12.

Under the terms of the Plea Agreement, the Government accepted a guilty plea to the lesser-included offense of conspiring to distribute and possess with the intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846. In the Plea Agreement, the parties stipulated that Gomez sold two guns to Martinez-Diaz. The defendant, however, preserved his right to argue that, as a matter of law, that conduct is insufficient to warrant the two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1). The defendant further submitted that a two-level reduction was warranted because he meets the criteria set forth in U.S.S.G. § 5C1.2(a)(1)-(5). The Government disagreed and did not stipulate to this adjustment.

Under the Government's calculation (with which Probation agrees), PSR ¶¶ 70-81, 84, 123, the applicable Guidelines offense level is 31, calculated as follows: Under U.S.S.G. § 2D1.1(c)(5), the base offense level is 30, with a two-level increase pursuant to U.S.S.G. § 3B1.3 because the defendant abused a position of public trust in a manner that significantly facilitated the commission or concealment of the offense; and a two-level enhancement under U.S.S.G § 2D1.1(b)(1) because a firearm was possessed. The Plea Agreement also assumed a two-level reduction due to the defendant's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), and an additional one-level reduction due to the defendant's timely notice of his intention to plead guilty, pursuant to U.S.S.G. § 3E1.1(b). The Plea Agreement calculated the defendant's Criminal History Category as I. That calculation results in a Guidelines range of 108 to 135 months' imprisonment.

The defendant's calculation, which is premised on the defendant's eligibility for safety-valve relief, results in a Guidelines range of 70 to 87 months' imprisonment. *See* Def. Mem. at 19.

The Probation Department recommends a sentence of 84 months' imprisonment, to be followed by a three-year term of supervised release. PSR at 32–34.

### C. Discussion

#### 1. Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," noting that that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After making the initial Guidelines calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid

February 4, 2020
Page 4

unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. The Two-Point Enhancement for Weapons Possession Applies

The two-point enhancement for possession of a dangerous weapon is warranted. Under U.S.S.G. § 2D1.1(b)(1), if a dangerous weapon "was possessed," a two-level enhancement is warranted. This enhancement applies if the conduct at issue is "relevant to the offense." *United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991) (citing U.S.S.G. § 1B1.3). When the offense is a drug conspiracy, this includes all acts and omissions during the commission of the offense "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). To that end, under the relevant application notes, the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, Application Note 11(A); *Pellegrini*, 929 F.2d at 56 (finding that enhancement applied because weapon was present at the place where drugs were stored); *see also United States v. Ryan*, 2019 WL 3849549, at *2 (2d Cir. Aug. 16, 2019) (finding that an enhancement under U.S.S.G. § 2K2.1(b)(6)(B) was appropriate because of the "well-known connection between firearms and drug trafficking" and "when a defendant sells a firearm to a known drug dealer, in most if not all cases it is reasonable to infer that the defendant understood, or had 'reason to believe,' that the firearm would be used in connection with another felony."); *United States v. Bermudez*, 529 F.3d 158, 170 (2d Cir. 2008) ("It is axiomatic that drug dealing and guns go hand in hand"); *United States v. Hernandez*, 85 F. App'x 269, 271 (2d Cir. 2004) (noting that "guns are frequently used tools of the drug trade"); *United States v. Vegas*, 27 F.3d 773, 778 (2d Cir.1994) ("drug dealers commonly 'keep firearms on their premises as tools of the trade.'").

Gomez argues that the Government has not outlined "any event or specific drug trafficking activity" connecting Gomez's guns to the conspiracy. Def. Mem. at 18. Gomez is correct—the Government is not aware of any evidence tying Gomez-supplied guns to a particular event in the life of the conspiracy—but his effort is misdirected. As noted above, the question is whether the

conduct at issue (the possession of the guns and provision of the guns to Martinez-Diaz) relates to the offense of conviction, the narcotics conspiracy. *See, e.g.*, *Pellegrini*, 929 F.2d at 56. It does. Here, Gomez admitted that he sold two firearms to Martinez-Diaz, whom he knew to be a drug dealer, in the context of a relationship where Gomez (a law enforcement officer) provided occasional assistance and continuing silence to Martinez-Diaz as part of a mutual criminal relationship. Gomez admitted, for example, that he picked up money in 2008 for Martinez-Diaz that he should have known came from illegal sources, and that he shared information with Martinez-Diaz in 2009 about how to detect traps in vehicles—secret compartments used to hide narcotics and other tools of the drug trade—as well as locations to avoid that were under investigation. ECF Doc. 290 at 24-25. The defendant even acknowledged that he knew that Martinez-Diaz "was a drug dealer and what I did allowed him to continue his drug trafficking." *Id.* at 24:19-20. Taken together, these facts alone show that it was reasonably foreseeable to Gomez that the guns would be used in connection with drug trafficking.

According to the defense sentencing submission, in approximately 2008—around the same time that the defendant picked up money for Martinez-Diaz and shared sensitive law enforcement information with Martinez-Diaz—the defendant agreed to sell firearms to Martinez-Diaz for the "personal use" of Martinez-Diaz and his wife. Def. Mem. at 17. Regardless of the defendant's claimed understanding of why Martinez-Diaz wanted the guns, at bottom, the defendant sold guns to Martinez-Diaz, an individual he understood to be a drug trafficker, during the course of their participation in a narcotics conspiracy. The defendant—particularly with his law enforcement training and experience—cannot seriously claim that he did not understand that firearms are tools of the drug trade. *See Bermudez*, 529 F.3d at 170; *United States v. Batista*, 732 F.Supp.2d 82, 95-98 (E.D.N.Y. 2010) (finding that a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) was warranted because it was reasonably foreseeable to the defendant, a trained NYPD detective, that a firearm would be used in the course of the conspiracy). The defendant has failed to demonstrate that it is "clearly improbable" that the firearms he sold to Martinez-Diaz were connected to the drug conspiracy, so his challenge to the firearms enhancement should be denied.

Accordingly, it was reasonably foreseeable that the guns would be used in connection with that criminal activity. *See* U.S.S.G. § 1B1.3(a)(1)(B). Similarly, under the terms of the Plea Agreement, the defendant is not safety valve eligible pursuant to U.S.S.G. § 5C1.2(a)(2), as he possessed a firearm in connection with the offense.

### 3. A Sentence Within the Guidelines Range is Reasonable in this Case

The Government submits that a sentence within the Guidelines Range would reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and in general, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A)-(C).

First, a sentence within the Guidelines Range would appropriately reflect the serious nature of the offense. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant's behavior reveals a profound disregard for the law. The defendant was a federal law enforcement officer, an individual entrusted to enforce the narcotics laws of the United States. Instead, the defendant repeatedly chose to abuse his position of trust and betray those laws. He helped narcotics traffickers evade detection by law

enforcement by providing sensitive law enforcement information. Moreover, this was not a one-time error in judgment. The defendant participated in the narcotics conspiracy for an extended period of time. His position as a law enforcement officer helped the conspiracy to protect and conceal its unlawful activities, providing the drug trafficking organization with a highly valuable asset. The defendant sold guns to Martinez-Diaz, an individual he knew was a drug dealer associated with violent criminals. He assisted a violent narcotics trafficking organization involved in shipping thousands of kilograms of cocaine from Puerto Rico to New York. Further, cocaine is a highly addictive and dangerous drug, and thus cocaine distribution merits significant punishment, to reflect the harm such distribution inflicts on individuals and communities. Thus, the defendant's role in assisting La ONU, particularly in his capacity as a law enforcement officer, warrants a significant sentence.

Second, the need for general deterrence weighs in favor of a Guidelines sentence. Due to the defendant's position as a law enforcement officer, there is a greater than usual case for general deterrence here. It is likely that the sentence imposed will be widely known in the law enforcement community. It is important to send a clear message to those who would consider abusing positions of trust that such misuse of law enforcement authority will be met with serious consequences. A significant sentence is necessary in this case to reinforce and amplify the message that the judicial system takes corruption seriously and that law enforcement officers' obligations and oath to uphold the law must inform their every decision.

Third, Gomez's appeals for leniency do not justify the sentence he seeks.



As such, a sentence of imprisonment within the applicable Guidelines Range would adequately balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

## Conclusion

      For the reasons set forth above, the Government respectfully submits that a Guidelines sentence would be reasonable in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

by:  s/                         
Jordan Estes / Allison Nichols /
Lara Pomerantz / Andrew Thomas
Assistant United States Attorneys
(212) 637-2543 / 2366 / 2343 / 2106

cc:     Bertram C. Okpokwasili, Esq. (by ECF)